UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>v.<br>JACOB KLAPMAN,<br>Defendant. | Criminal Action No.<br>26-10041-BEM |

**MEMORANDUM AND ORDER ON**
**<u>DEFENDANT'S MOTION TO SUPRESS</u>**

**MURPHY, J.**

Defendant Jacob Klapman moves this Court to suppress evidence recovered in connection with the execution of two search warrants. Mr. Klapman argues both warrants, one for GPS monitoring of his vehicle, and the second for a search of his person, were issued without the requisite probable cause. For the reasons stated herein, the Court concludes that both warrants were supported by probable cause and denies the motion.

## I. Background

This case arises from the Metro Boston Gang Task Force's ("Task Force") investigation into the Harvard Street drug trafficking organization.[1] Dkt. 33-2 ¶ 11. As part of that investigation, officers obtained a federal search warrant for GPS monitoring of a rental vehicle controlled by Keanu Fernandes, a member of the Harvard Street drug trafficking organization. *Id.* ¶¶ 8, 11; *see also* Dkt. 33-1 ¶ 12. Surveillance of Mr. Fernandes led the Task Force to Mr. Klapman, an

[1] The facts in this memorandum and order are based upon representations made by law enforcement in three warrant affidavits, Dkts. 33-1, 33-2, 33-3, police body camera footage, Dkt. 33-5, an affidavit in the criminal complaint filed against Mr. Fernandes, Dkt. 33-8, Mr. Klapman's memorandum in support of his motion to suppress, Dkt. 25 and the Government's opposition, Dkt. 33.

individual previously known to investigators through prior criminal activity. Dkt. 33-1 ¶ 70 & n.6. Mr. Klapman's Massachusetts Board of Probation record includes over four dozen entries. Dkt. 33-2 ¶ 12. As relevant here, he is currently charged in Plymouth Superior Court with Trafficking 200+ Grams of Cocaine. *Id.*

In June 2025, a confidential informant and customer of Mr. Fernandes ("CI #1") told investigators that they had been purchasing cocaine from an individual using the phone number 617-639-4823 (the "4823 number"). *Id.* ¶ 13. Records obtained from a cellular provider indicated the 4823 number had been used to contact "several" phone numbers known to be used by illegal narcotics buyers and users. *Id.* ¶ 14. The 4823 number had also been in contact with a second confidential informant ("CI #2"). *Id.* ¶ 15. CI #2 told investigators that the 4823 number was used by Mr. Klapman, and that they had contacted the 4823 number to purchase cocaine from Mr. Klapman or Mr. Klapman's "runner" for about three to six months.[2] *Id.*

While surveilling Mr. Fernandes on July 17, 2025, investigators observed him meet with Mr. Klapman in a Quincy, Massachusetts parking garage. Dkt. 33-1 ¶ 70. Upon reviewing security footage from that garage, investigators observed Mr. Fernandes and Mr. Klapman enter a nearby local restaurant and exit 20 minutes later with a "white to-go bag." *Id.* ¶ 71. Mr. Klapman "walked, with his hand inside of his shirt" and briefly joined Mr. Fernandes inside his vehicle. *Id.* Mr. Klapman then exited the vehicle with the "white to-go bag" and subsequently left the parking garage in his own vehicle. *Id.*

Further review of security camera footage revealed that Mr. Klapman and Mr. Fernandes had previously met at the same parking garage earlier that month on July 7, 2025. *Id.* ¶ 72. During

[2] According to CI #2, Mr. Klapman would often use a "runner," an associate who would "distribute cocaine on his behalf." Dkt. 33-2 ¶ 15.

that encounter, the two left the same local restaurant and both entered Mr. Fernandes's vehicle. *Id.* Mr. Klapman, who "appeared to be empty-handed prior to entering the vehicle" then exited the vehicle "with a large black bag." *Id.*

On July 23, 2025, Officer Matthew Morrissey, a Massachusetts State Police Officer and Task Force member, observed—via GPS tracking—Mr. Fernandes's vehicle travel to the Quincy parking garage once again. *Id.* ¶ 73. Officer Morrissey "attempted to get to the garage to physically observe" Mr. Fernandes and Mr. Klapman meet again but was too late to spot Mr. Fernandes. *Id.* Officer Morrisey did, however, manage to later observe Mr. Klapman's vehicle, which he followed into a parking lot where Klapman "retrieve[d] three bags from the rear of the [vehicle]."[3] *Id.* Officer Morrisey later reviewed the July 23, 2025 security footage from the garage and observed Mr. Fernandes and Mr. Klapman engage in a familiar pattern of behavior. *Id.* ¶ 74. After entering the local restaurant separately, the pair exited the restaurant together, both entered Mr. Fernandes's vehicle, and "[a]fter 20 seconds" Mr. Klapman exited Mr. Fernandes's vehicle "with a bag in his hand," which Officer Morrisey attested "fit the same descriptive qualities as the brown bag" he personally observed Mr. Klapman retrieve from his vehicle later that evening. *Id.*

Officer Morrissey continued surveilling Mr. Klapman following the July 23 meetup with Mr. Fernandes.[4] On July 28, 2025, Officer Morrissey observed Mr. Klapman exit an apartment complex carrying "a large reusable shopping bag, which appeared to be weighted and filled with

---

[3] Officer Morrissey did not see Mr. Klapman's vehicle in the parking garage. Instead, he travelled to a different street in Boston, where he "observed [Mr. Klapman's] Ford Escape travelling on a daily basis." Dkt. 33-1 ¶ 73. After five minutes of surveillance "the Ford Escape passed by [Officer Morrissey's] location." *Id.*

[4] In the GPS Affidavit, Officer Morrissey detailed that Mr. Klapman regularly used two different rental cars, both rented by a known associate of Mr. Klapman. Dkt. 33-2 ¶¶ 16–18. Mr. Klapman's driver's license was suspended at the time of this investigation. *Id.* ¶ 19 n.4.

something." Dkt. 33-2 ¶ 19. Mr. Klapman drove away with the shopping bag. *Id.* Though Officer Morrissey attempted to tail Mr. Klapman, he was unable to do maintain surveillance "due to the extremely slow speeds" at which Mr. Klapman was driving. *Id.* Officer Morrissey attested that, based upon his experience, he believed Mr. Klapman was engaged in "counter-surveillance techniques" by driving so slow as to "make it difficult for law enforcement to conduct surveillance without being detected." *Id.* ¶ 19 n.4.

On August 6, 2025, investigators attempted to follow Mr. Klapman in his vehicle after he left an apartment complex carrying "an off-white reusable shopping bag" which appeared "weighed down by its contents." *Id.* ¶ 20. Once again, officers were stymied in their attempt to follow Mr. Klapman "due to his driving tactics of operating at a very slow speed and using side streets." *Id.* Officers later found Mr. Klapman's vehicle parked at 308 Quarry Street in Quincy. *Id.* ¶ 21. Investigators recognized that address as "the registered address for a contact on the 4823 number's call records" known to investigators as a "drug abuser." *Id.* ¶¶ 21–22. Investigators observed Mr. Klapman exit the building with a same reusable shopping bag "folded up into a square under his arm." *Id.* ¶ 21.

Armed with these facts, on August 14, 2025, Officer Morrisey submitted an affidavit requesting a search warrant to affix GPS monitoring technology to Mr. Klapman's rental car. *See generally* Dkt. 33-2 ("GPS Affidavit"). The GPS Affidavit included, as an exhibit, a previous affidavit submitted for the GPS search warrant application issued in the investigation of Mr. Fernandes. *See* Dkt. 33-1 ("Fernandes Affidavit"). The court issued the federal tracking warrant on August 14, 2025, and investigators attached the GPS device to Mr. Klapman's vehicle on August 15, 2026. Dkt. 33-3 ¶ 23.

Now equipped with GPS tracking on both Mr. Klapman's and Mr. Fernandes's vehicles, Officer Morrissey observed, via the GPS tracking software, the two vehicles meet at the very same Quincy parking garage where the two had previously met three times in July 2025. Dkt. 33-3 ¶ 24. After the meetup, when Mr. Klapman returned to what investigators believed was his primary residential address, officers observed Mr. Klapman walk across the parking lot carrying "a bag which appeared weighted and filled with something." *Id.* ¶¶ 24, 27. Investigators also tracked Mr. Klapman's vehicle as it stopped at the home of an individual "know[n] . . . to abuse cocaine and/or fentanyl" once on August 16, 2025 and again on August 18, 2025. *Id.* ¶¶ 25–26. That individual was "a top caller on the 4823 number used by [Mr. Klapman]." *Id.* ¶ 25.

Using the information gleaned from the GPS monitoring, along with prior representations made to the Court in the Fernandes Affidavit and GPS Affidavit, Officer Morrissey filed an application for a search warrant of Mr. Klapman's person. *See generally id.* ("Person Affidavit"). The court issued the warrant on August 20, 2025, and required that it be executed before September 3, 2025, between the hours of 6:00 a.m. and 10:00 p.m. *Id.* at 1.

On September 1, 2025, investigators tracked Mr. Klapman's vehicle to his residence in Dorchester and executed the search warrant. Dkt. 33-8 ¶ 17. At the time, Mr. Klapman was carrying "a large reusable shopping bag in his right hand." *Id.* Investigators, including Officer Morrissey, approached Mr. Klapman at approximately 9:48 p.m. *See* Dkt. 33-5 ("Morrissey Footage") at 21:48:53.[5] Mr. Klapman turned, fled from the police, and attempted to throw the bag over a chain-link fence adjacent to the parking lot. Dkt. 33-8 ¶ 18. He was apprehended by police

[5] Dkt. 33-5 contains body camera footage from both Matthew Morrissey and Michael Reynolds. For the sake of brevity and clarity, the Court cites to Dkt. 33-5 as "Morrissey Footage" or "Reynolds Footage" depending on which officer's body camera footage is being referenced. The hours, minutes and seconds used in the citations refers to the time stamp on the footage, rather than the duration of the video.

at 9:49 p.m. *See* Morrissey Footage at 21:49:10. Mr. Klapman was informed of his rights at 9:55 p.m. *See* Reynolds Footage at 21:55:34–21:56:06. Other officers worked to gather the items from the shopping bag, which had caught on the chain link fence, causing items to fall out of the bag on both sides of the fence. Dkt. 33-8 ¶¶ 18–19. Officers finished acquiring the items scattered from the bag at 9:54 p.m. *See* Morrissey Footage at 21:54:35–41. The recovered items included three cellular phones and a shipping box containing a brick-shaped package and a small bag. Dkt. 33-8 ¶ 19. Analysis of the brick-shaped package by the Drug Enforcement Agency later tested positive for cocaine with a net wight of approximately 1003.3 grams. *Id.* ¶ 20. The contents of the small bag tested positive for fentanyl with a net weight of approximately 98.1 grams. *Id.*

Mr. Klapman was charged with violation 21 U.S.C. § 841(a)(1), (b)(1)(B)(vi), and (b)(1)(B)(ii) for possession with intent to distribute 40 grams of fentanyl or more and 500 grams or more of cocaine. Dkt. 14. at 1. He filed his motion to suppress on May 25, 2026. Dkt. 24; *see also* Dkt. 25 ("Mem."). The Government filed its opposition on June 23, 2026. Dkt. 33 ("Opp."). The Court held a hearing on August 11, 2026, and took the motion under advisement. Dkt. 35.

## II. **Standard of Review**

The Fourth Amendment protects against "unreasonable searches and seizures." U.S. Const. amend. IV. "With limited exceptions, it requires police officers to secure a search warrant supported by probable cause prior to effecting a search or seizure." *United States v. Gifford*, 727 F.3d 92, 98 (1st Cir. 2013). "In assessing whether a search warrant affidavit establishes probable cause, the court considers the totality of the circumstances, based on the facts and supported opinions set out within the four corners of the affidavit." *United States v. Cortez*, 108 F.4th 1, 8 (1st Cir. 2024) (cleaned up). "A finding of probable cause 'demands proof sufficient to support a fair probability that a crime has been committed and that evidence of that crime is likely to be found within the objects to be searched.'" *United States v. Sheehan*, 70 F.4th 36, 44 (1st Cir. 2023)

(quoting *United States v. Coombs*, 857 F.3d 439, 446 (1st Cir. 2017)). "Fair probability is less than a more-likely-than not standard." *United States v. Gonzalez*, 113 F.4th 140, 148 (1st Cir. 2024); *see also Kaley v. United States*, 571 U.S. 320, 338 (2014) ("Probable cause, we have often told litigants, is not a high bar.").

"Where, as here, the search was pursuant to a warrant issued by a magistrate judge, the defendant faces an even higher burden." *Cortez*, 108 F.4th at 7. In its review, the Court "must also 'give significant deference to the magistrate judge's initial evaluation,' disagreeing only if there is 'no substantial basis for concluding that probable cause existed.'" *United States v. Estrada*, 791 F. Supp. 3d 229, 233 (D. Mass. 2025) (quoting *United States v. Chiu*, 36 F.4th 294, 297 (1st Cir. 2022) (internal citations omitted)). "Under the exclusionary rule, when a magistrate judge issues a warrant that is not supported by probable cause, the evidence obtained from the search is usually suppressed." *Gonzalez*, 113 F.4th at 148.

## III. Discussion

### A. The GPS Warrant

Mr. Klapman first challenges the GPS warrant, arguing that the facts alleged in the GPS Affidavit were insufficient to constitute probable cause. Mem. at 6. He asserts that "convoluted multi-informant information, lacking corroboration" fails to provide a sufficient factual basis for a warrant, that "[m]ere association with a drug dealer," like Mr. Fernandes, "does not impose criminal liability," and that "walking to his car with a reusable shopping bag containing unknown items" is not "meaningful evidence of criminal activity." *Id.* In response, the Government argues that the totality of the evidence presented in the GPS Affidavit was sufficient to establish "probable cause to believe that [Mr. Klapman's vehicle] locations would lead to evidence of criminal activity." Opp. at 11. The Court agrees with the Government that the GPS Affidavit established probable cause.

The GPS Affidavit, with the Fernandes Affidavit appended as an exhibit, includes a bevy of facts. *See generally* Dkt. 33-2; *see also* Opp. at 1 n.1 (noting the Fernandes Affidavit was attached as an exhibit to the GPS Affidavit and Person Affidavit). The Court begins with Mr. Klapman's objections to the tips provided by two confidential informants. Mem. at 6. To determine if confidential informant tips may constitute probable cause, the First Circuit considers several "non-exhaustive" factors, including (1) whether the affidavit establishes the probable basis of knowledge and veracity of the informant, (2) whether the informant's statements reflect firsthand knowledge, (3) whether the informant's factual statements were corroborated wherever reasonable and practicable, and (4) whether the officer affiant determined, based on his or her experience and expertise, the probable significance of the information provided. *United States v. Tiem Trinh*, 665 F.3d 1, 10 (1st Cir. 2011) (collecting cases).

The GPS Affidavit satisfies those factors. It describes information gleaned from CI #1 and CI #2 connecting Mr. Klapman to the 4823 number which was known to have been in contact with other phone numbers "utilized by illegal narcotics buyers and users." Dkt. 33-2 ¶¶ 13–15. CI #1 told Officer Morrisey he had purchased cocaine from an individual using the 4823 number "over the last approximately six months."[6] *Id.* ¶ 13. After subpoenaing contact records, officers recognized the 4823 number "was in contact" with CI #2. *Id.* ¶¶ 14–15. CI #2 told investigators that they "used [that] number to purchase cocaine from [Mr. Klapman] or [Mr. Klapman's] 'runner'" over multiple months. *Id.* ¶ 15. CI #2 knew the 4823 number was "controlled and used by [Mr. Klapman]." *Id.* The affidavit affirms the reliability of both confidential informants, noting that CI #1 was also a customer of Mr. Fernandes, Dkt. 33-1 ¶ 57, and CI #2 "has provided information to law enforcement since approximately 2023" and "has provided information that has

[6] CI #1 knew this individual as "Tony." *Id.* ¶ 13.

resulted in arrests and the seizure of controlled substances," Dkt. 33-2 ¶ 15 n.3. The identities of both informants were known to law enforcement. *See id.*; Dkt. 33-1 ¶ 57. All told, the information provided by both confidential informants establishes first-hand knowledge of Mr. Klapman's involvement in selling cocaine and a relationship with Mr. Fernandes. Additionally, CI #1's and CI #2's statements were corroborated upon officers observing Mr. Klapman's multiple rendezvous with Mr. Fernandes in the Quincy parking garage.[7] Dkt. 33-1 ¶¶ 70–74.

The GPS Affidavit also includes a host of other facts which bolster a finding of probable cause. In detailing Officer Morrisey's expertise and experience, Dkt. 33-2 ¶¶ 1–6,[8] Mr. Klapman's evasive driving, *id.* ¶¶ 19–20,[9] Mr. Klapman's prior criminal history, including a pending charge for trafficking cocaine, *id.* ¶ 12,[10] and an ongoing investigation into Mr. Fernandes, a known member of a drug trafficking organization, *see generally* Dkt. 33-1, the GPS Affidavit sufficiently establishes a "fair probability" that Mr. Klapman's vehicle would contain evidence connecting him to illicit drug sales. *Coombs*, 857 F.3d at 448; *see also United States v. Nova*, 478 F. Supp. 3d 87, 92 (D. Mass. 2020) (noting that "location information would assist law enforcement in identifying [the defendant's] residence, a potential stash house and his narcotics supplier"). And perhaps most

[7] Mr. Klapman cites to *Gifford*, for the proposition that uncorroborated confidential informant information is insufficient to establish probable cause. *See* Mem. at 6 (citing *Gifford*, 727 F.3d at 99–101). But in that case, there was only one confidential informant, relatively little corroborating evidence, and "no independent police surveillance." *Gifford*, 727 F.3d at 100. Here, there were two informants, corroborating evidence, and, as the GPS Affidavit establishes, significant independent police surveillance of Mr. Klapman's movements.

[8] *See United States v. Floyd*, 740 F.3d 22, 35 (1st Cir. 2014) ("We have, with a regularity bordering on the echolalic, endorsed the concept that a law enforcement officer's training and experience may yield insights that support a probable cause determination.") (citing cases).

[9] *See e.g.*, *United States v. Drake*, 673 F.2d 15, 19 n.3 (1st Cir. 1982) (noting that evasive driving, among other allegations "add up to the reasonable probability of illegal activity").

[10] *See e.g.*, *United States v. Taylor*, 985 F.2d 3, 6 (1st Cir. 1993) ("An affiant's knowledge of the target's prior criminal activity or record clearly is material to the probable cause determination."); *see also United States v. McNickles*, 2005 WL 1745661, at *2 (D. Mass. July 25, 2005) (denying motion to suppress because probable cause was established where, like Mr. Klapman, the defendant "had pending charges for trafficking cocaine").

importantly, the GPS Affidavit alleges a series of brief meetups between Mr. Klapman and Mr. Fernandes from which Mr. Klapman would leave Mr. Fernandes's vehicle, often with an weighed-down opaque bag. *See* Dkt. 33-2 ¶¶ 19–20; Dkt. 33-1 ¶¶ 70–74. Equipped with the totality of the evidence, it was reasonable to conclude these clandestine meetups were not, as Mr. Klapman alleges, "mere association with a drug dealer." Mem. at 6. These additional facts, combined with the reliable information from CI #1 and CI #2, were sufficient to establish probable cause.

**B. <u>The Person Warrant</u>**

Mr. Klapman objects to the issuance of the personal search warrant as well, arguing that it too failed to establish probable cause. Mem. at 8. He alleges that the Person Affidavit contained the same "inadequate information repeated from the prior warrant applications" and that "[i]t did not claim any drugs were recovered" or contain evidence of "controlled buys or recent documented transactions." *Id.* The Government argues first that the information in the GPS Affidavit and the appended Fernandes Affidavit *was* adequate, and second, that additional facts alleged in the Person Affidavit also established probable cause. Opp. at 13–14.

Having found that the information in the GPS Affidavit did constitute probable cause, *see supra* Section III.A, the Court turns to the new allegations in the Person Affidavit. After executing the GPS Warrant on Mr. Klapman's vehicle, officers again observed his vehicle and Mr. Fernandes's vehicle each arrive at a parking garage in Quincy, Massachusetts. Dkt. 33-3 ¶ 24. Upon returning to what investigators believe was Mr. Klapman's primary residential address, officers observed Mr. Klapman walk across his parking lot carrying "a bag which appeared weighted and filled with something." *Id.*; *see also id.* at ¶ 27. The affidavit noted that investigators believed this was evidence of Mr. Klapman again meeting with Mr. Fernandes for a drug supply. *Id.* ¶ 24. Over the next few days, officers used the GPS tracking software to observe

Mr. Klapman's vehicle twice stop at the home of an individual "know[n] to abuse cocaine and/or fentanyl." *Id.* ¶¶ 25–26. That individual is "a top caller on the 4823 number used by [Mr. Klapman]." *Id.* ¶ 25. Investigators therefore believed that Mr. Klapman was visiting a customer. *Id.*

The search of a person "must be supported by probable cause particularized with respect to that person." *Maryland v. Pringle*, 540 U.S. 366, 373 (2003) (quoting *Ybarra v. Illinois*, 444 U.S. 85, 91 (1979)). Here, the Person Affidavit outlines substantial facts which, when viewed in their totality, establish a fair probability that evidence of drug dealing would be found on Mr. Klapman's person.

Additionally, Mr. Klapman alleges that the Person Warrant was illegally executed outside of its required 6:00 a.m. to 10:00 p.m. window. Mem. at 7. However, the police body camera footage plainly demonstrates the officers executed the warrant within the appropriate time constraints. Officers first approached Mr. Klapman at 9:48 p.m. *See* Morrissey footage at 21:48:53. He fled from police, tossed the bag and was apprehended by 9:49 p.m. *See id.* at 21:49:01–10. He was informed of his rights at 9:55 p.m. *See* Reynolds Footage at 21:55:34–21:56:06. Officers finished acquiring the items scattered from Mr. Klapman's bag at 9:54. *See* Morrisey Footage at 21:54:35–41.

Finally, even if some of the items in the bag were recovered after 10:00 p.m., Mr. Klapman abandoned his property while fleeing from officers upon the execution of the Person Warrant before 10:00 p.m. *See California v. Hodari D.*, 499 U.S. 621, 623, 629 (1991) (affirming denial of motion to suppress where defendant, in fleeing from officers, "tossed away" what "was found to be crack cocaine"). "It is well settled that if a defendant abandons property while he is being pursued by police officers, he forfeits any reasonable expectation of privacy he may have had in

that property." *United States v. Soto-Beniquez*, 356 F.3d 1, 36 (1st Cir. 2003) (citing *Abel v. United States*, 362 U.S. 217, 241 (1960)). Here, Mr. Klapman's case "is indistinguishable from *Hodari D.*" *United States v. Wilkins*, 451 F. Supp. 3d 222, 230 (D. Mass. 2020) (denying motion to suppress where defendant, while fleeing from officers, tossed a pack of fentanyl under a parked car). Once he abandoned the bag, Mr. Klapman lost any reasonable expectation of privacy in its contents and Fourth Amendment protections no longer applied.[11]

**C. <u>The Good Faith Exception</u>**

The Government also maintains that, even if the affidavits were inadequate, the recovered evidence would still be admissible under the "good faith" exception to the exclusionary rule. *See United States v. Leon*, 468 U.S. 897, 922 (1984) (holding that the exclusionary rule does not apply when police engage in "objectively reasonable reliance" on a warrant later held to be invalid); *see also United States v. Pimentel*, 26 F.4th 86, 91–92 (1st Cir. 2022) ("[T]he good faith exception only saves searches 'that it was reasonable to believe were covered by the warrant.'" (quoting *Leon*, 468 U.S. at 918 n.19)). The Court agrees with the Government that a reasonably well-trained officer would not have known the warrants issued in this case were illegal. Here, there are no telltale signs of an illegal search. Mr. Klapman "does not allege that the officers acted recklessly or in bad faith in drafting their affidavits. Nor does [Mr. Klapman] claim that the magistrate[] [was] derelict in performing [her] duties or that the warrants were facially invalid." *Nova*, 478 F. Supp. 3d at 92. Aside from his unsuccessful allegation that the warrant was executed after 10:00 p.m., *see supra* Section III.B, Mr. Klapman does not claim the searches "exceeded the scope of

[11] Because both warrants were issued with the requisite probable cause, the Court need not address the Government's arguments that that the officers nevertheless had reasonable suspicion to conduct a stop of Mr. Klapman, which escalated to probable cause following his flight. Opp. at 16–19.

the warrant," *Pimentel*, 26 F.4th at 95. Therefore, even if the warrants had been issued without probable cause, the evidence could not be suppressed.

## IV. Conclusion

For the foregoing reasons, the two search warrants were issued with sufficient probable cause. Defendant's motion to suppress is DENIED.

**So Ordered.**

/s/ Brian E. Murphy
Brian E. Murphy
Judge, United States District Court

Dated: August 17, 2026